JAMES R. FELTON, ESQ. (SBN: 138767)
jfelton@gblawllp.com
JEREMY H. ROTHSTEIN, ESQ. (SBN: 316140)
jrothstein@gblawllp.com
G&B LAW, LLP
16000 Ventura Boulevard, Suite 1000
Encino, California 91436
Tel: (818) 382-6200 • Fax: (818) 986-6534


Attorneys for Debtor and Debtor in Possession
Cannon Constructors North, Inc.

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>CANNON CONSTRUCTORS NORTH, INC.,<br><br>Debtor and Debtor in Possession. | Case No.: 3:24-bk-30447-HLB<br><br>(Chapter 11)<br><br>**DEBTOR AND DEBTOR IN POSSESSION CANNON CONSTRUCTORS NORTH, INC.'S (I) RESPONSE RE: CREDITORS HOLLIDAY DEVELOPMENT LLC, HD MAYFAIR LLC, HD 3800 LLC, HD THIRD STREET INVESTORS, TWH-CS, L.P. AND HD RELIANT MAYFAIR, LLC'S MOTION TO CONVERT CHAPTER 11 CASE TO CHAPTER 7 CASE; AND (II) STATUS REPORT**<br><br><u>Hearing:</u><br>DATE:   May 14, 2026<br>TIME:   10:00 a.m.<br>CTRM:   19 and/or via zoom<br>       U.S. Bankruptcy Court<br>       450 Golden Gate Ave., 16th Fl.<br>       San Francisco, CA 94102 |

TO THE HONORABLE HANNAH L. BLUMENSTIEL, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND OTHER PARTIES IN INTEREST:

Debtor and Debtor in Possession Cannon Constructors North, Inc. ("Debtor"), submits this Response regarding Creditors Holliday Development LLC, HD Mayfair LLC, HD 3800 LLC, HD Third Street Investors, TWH-CS, L.P. and HD Reliant Mayfair, LLC's (the "Movants") Motion to

1

Case: 24-30447   Doc# 207   Filed: 05/07/26   Entered: 05/07/26 17:54:37   Page 1 of 10

Convert Chapter 11 Case to Chapter 7 Case [Doc. 203] (the "Motion"). This response is supported by the separately filed declarations of Ben Boyd and James Larry Pace. Capitalized terms used but not defined herein have the meanings ascribed to them in the Pace Declaration, the Boyd Declaration, or the Motion.

### A.    Introduction

The Motion breezily asserts that "[t]he Debtor has completed its only remaining project and sold its equipment," Mot. at 2:26, and implies that nothing remains to be done other than to file a mass of litigation, *see id*. at 2:14–22 (purporting to identify $1,491,639 in theoretical avoidance actions); *id*. at 4:16–21 (asserting that the case needs a "neutral third party who will investigate and prosecute" claims). The Motion further asserts "[t]he Debtor has lost money during the pendency of the case" and "has incurred $1,655,449.56 in unpaid administrative claims." *Id*. at 4:7–9.

The picture painted by the Motion is inaccurate. As detailed in the accompanying declarations, the Debtor has moved heaven and earth to secure payment for its final construction project, a 47-unit permanent supportive housing development at 2441 Broadway in Vallejo, California, designed for formerly unhoused individuals. Construction of that innovative and essential project is complete, but the Debtor has not been paid. The Debtor's contract counterparty, Firm Foundation, is depending on funding from the City of Vallejo. The Debtor and its professionals have invested countless hours and energy in trying to get the City to pay what is owed—including the funds necessary to satisfy the roughly $1.6 million in administrative claims (most of which are from union subcontractors) adverted to in the Motion.

Proposing a plan under these circumstances was certainly challenging—just as this case has been challenging. The Debtor's proposed Plan has several features that respond to the issues complained of in the Motion. First and foremost, the Plan **only** becomes effective if the City's funding ultimately comes through. *See generally* Plan Art. III.A & IV.A. If the funding does not materialize, the case will automatically convert. The Plan also provides for full payment or consensual compromise of administrative claims, authorizes settlements with subcontractors up to the amounts listed in Plan Exhibit 3, incorporates those settlements into the Plan, and delays the Effective Date until the Debtor can satisfy the funding and reserve conditions. Finally, rather than swamp the Court with a deluge of

2

26677730.3  32643.0007

claim objections and avoidance actions, the Plan proposes that creditors choose a non-litigation route that will, the Debtor submits, provide a surer and better result for all legitimate claims.

The Debtor has worked hard to get to this point. The proposed Plan—and any real chance for a recovery to general unsecured creditors—rests onpeti the Debtor receiving the remaining funds the Debtor is owed for years of important work. The notion that a chapter 7 trustee would have a higher likelihood of securing such payment is fanciful. The Motion should be denied.

**B.      Standard**

The Motion seeks conversion under section 1112(b). Movants therefore bear the burden to show cause. *See* 7 COLLIER ON BANKRUPTCY ¶ 1112.04[2] (16th ed., 2026) ("Congress substantially revised section 1112(b)(1) in 2005 to provide that the court shall dismiss or convert the case only if the movant establishes cause." (emphasis omitted) (citing *In re Starmark Clinics, LP*, 388 B.R. 729, 735–36 (Bankr. S.D. Tex. 2008)). Movants have not done so. As a threshold matter, the Motion is supported by no affidavits, declarations, or other admissible evidence. *See generally* B.L.R. 9013-1(d)(1) ("Factual contentions made in support of, or in opposition to, any motion, application or objection should be supported by affidavits or declarations and appropriate references to the record."); *see also* Fed. R. Bankr. P. 9014 (generally providing that contested matters are to be decided on evidence, not mere argument). More fundamentally, nowhere does the Motion actually identify "cause" for conversion. The statutory list of what constitutes cause is as follows:

(A)   substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

(B)   gross mismanagement of the estate;

(C)   failure to maintain appropriate insurance that poses a risk to the estate or to the public;

(D)   unauthorized use of cash collateral … ;

(E)   failure to comply with an order of the court;

(F)   unexcused failure to satisfy timely any filing or reporting requirement … ;

(G)   failure to attend the meeting of creditors … or an examination … without good cause shown by the debtor;

(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee … ;

(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K) failure to pay any fees or charges required;

(L) revocation of an order of confirmation under section 1144;

(M) inability to effectuate substantial consummation of a confirmed plan;

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P) failure of the debtor to pay any domestic support obligation ….

11 U.S.C. § 1112(b)(4).

Of this list, the only ground arguably touched upon in the Motion is the first— "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." *Id*. § 1112(b)(4)(A). But critically, there will be "loss to or diminution of the estate" **only** if the Debtor fails to receive the money it is owed for its final project—and it would be **only** in that unhappy circumstance that the Debtor would find itself without a "reasonable likelihood of rehabilitation." *Id*. Thus, for all practical purposes, the issue before the Court is whether to afford the Debtor the opportunity to continue working diligently to secure payment of what it is owed (the path proposed in the Plan), or whether to abandon that process and put the case into chapter 7. *Cf*. 7 COLLIER ON BANKRUPTCY ¶ 1112.04[5] (observing that "[i]n defining the essential role of the cause standard, it is useful to bear in mind the fundamental purposes and limitations of chapter 11"—*i.e.*, "'preserving going concerns and maximizing property available to satisfy creditors.'" (quoting *Bank of America Nat' l Tr. & Sav. Ass' n v. 203 N. LaSalle St. P' ship*, 526 U.S. 434, 453 (1999)).

**C. The Movants' Specific Criticisms of the Plan Lack Merit.**

Without attempting to turn the cursory and unsupported Motion into a mini-confirmation hearing, the centrality of the Movants' criticisms of the Plan to their argument for conversion

necessitates an appropriate response. As detailed below, the Movants' complaints about the Plan are without merit and provide no basis to convert.

**1. The Plan's Effectiveness Hinges on Funding and Administrative Solvency.**

As detailed in the accompanying declarations, the success of this case turns on the Debtor receiving the remaining payment it is owed for completing its construction project. The Debtor has repeatedly confirmed that the City has all the information necessary to evaluate its funding proposal, including a detailed accounting of remaining Project costs, the allocation among subcontractor and union balances, and the rationale for the proposed settlement amount. The Debtor has also actively requested that the matter be scheduled for City Council consideration, consistently followed up to ensure any questions were addressed, and provided timely clarifications to facilitate review and decision-making. These efforts demonstrate that the Debtor has diligently pursued a resolution while coordinating the Plan's timing with the City's internal processes, all with the objective of ensuring that subcontractors and unions can be paid efficiently, and the Plan can become feasible without unnecessary delay.

Among other things, the Debtor submitted a comprehensive letter on April 2, 2026, in response to the City's request for further detail on the cost of the project. Boyd Decl., Ex. 1. It was the most recent, but not the only, substantive explanation that the Debtor provided. That letter breaks down post-Measure P cost increases into categories including known and expected added costs, unanticipated extra costs, owner-directed design changes, and continued schedule delays, totaling $1,506,409 and leaving $1,276,541.37 outstanding. It also identifies the unpaid subcontractor balances and explains why a coordinated, comprehensive resolution is required.

Recognizing the difficulty of proposing a Plan with this fundamental in flux, the Debtor proposed a Plan that would only become effective if sufficient conditions were met to make it feasible. Article III.A provides that the Plan will be funded by the Final Construction Payment and the Debtor's cash on hand. Article IV.A then provides that the Effective Date will not occur unless the Debtor has sufficient cash to make all required Effective Date payments, pay disputed or not-yet-allowed administrative claims in their asserted amounts, pay administrative claims the Debtor reasonably expects to be asserted after the Effective Date, and maintain required reserves. Article IV.C adds an

5

DEBTOR AND DEBTOR IN POSSESSION CANNON CONSTRUCTORS NORTH, INC.'S RESPONSE RE: MOTION TO CONVERT CHAPTER 11 CASE TO CHAPTER 7 CASE

Case: 24-30447    Doc# 207    Filed: 05/07/26    Entered: 05/07/26 17:54:37    Page 5 of 10

outside date: if the Effective Date has not occurred by June 5, 2026, or another date ordered by the Court, the case automatically converts to chapter 7.

That structure directly addresses the risk Movants identify. If the City and Firm Foundation do not provide sufficient funding, the Plan will not become effective. If the City funds the full amount requested, the Debtor expects the Plan to be feasible. If the City funds a lesser but still acceptable amount, the Debtor will need to reach individual settlements with administrative creditors to make the Plan feasible. The Debtor has been working on both parts of that equation: seeking a funding resolution with the City and Firm Foundation, while also discussing administrative-claim compromises so that any acceptable funding number can be translated into a confirmable and effective plan.

The Motion does not address that structure. It points to administrative claims and limited cash as though those facts alone answer the section 1112(b) question. They do not. They are the problems the Plan is designed to solve. The Plan provides for full payment or consensual compromise of administrative claims, authorizes settlements with subcontractors up to the amounts listed in Exhibit 3, incorporates those settlements into the Plan, and delays the Effective Date until the Debtor can satisfy the funding and reserve conditions.

**2.  The Exhibits Show Considered Evaluation, Not Careless Inaction.**

The Motion repeatedly asserts that the Debtor has not investigated avoidance claims or third-party claims. Plan Exhibit 5 carefully addresses potential material claims against third parties. It identifies potential 90-day vendor and supplier transfers, payroll and employee-related transfers, transfers to Gregory R. Shaughnessy, the IRS tax deposit and Cannon South allocation issue, Factory OS-related claims, Project-related claims, and claims against HD Reliant Mayfair. Movants may disagree with the Debtor's business judgment, but the record does not support the assertion that the Debtor ignored these issues.

The Debtor made those judgments under severe budget constraints. Plan Exhibit 5 explains that the estate faces a risk of administrative insolvency and therefore must conserve resources and avoid litigation that is uncertain, expensive, or difficult to collect. The Motion treats potential claims as if identifying a defendant creates value. It does not. Litigation requires investigation, pleadings, discovery, expert work, motion practice, trial preparation, and collection. This estate does not have the

2667730.3  32643.0007

G&B LAW

funds to convert every conceivable claim into litigation. The relevant question is whether pursuit of a claim is likely to improve net creditor recoveries after administrative expense.

That distinction is especially important for the IRS tax deposit and Cannon South issues. Plan Exhibit 5 explains that the $650,000 deposit relates to the Debtor's consolidated tax group and potential allocation issues involving Cannon South and the Debtor's parent. The Debtor's forensic accountant preliminarily understood that the Debtor's parent and Cannon South more likely than not used accounting methods that allocated a disproportionate share of tax liability to the Debtor. But Plan Exhibit 5 also explains why the issue could not responsibly be treated as ready-made litigation. A full evaluation would require significant additional forensic accounting and legal work, including work to connect the facts to the elements of sections 547 and 548 and to evaluate potential defenses. Michael Stieger, a principal source of knowledge regarding the relevant tax allocation and a likely source of recovery if any claim existed, passed away in December 2025. The Debtor's budget for forensic work was limited, and Golbahar Consulting Group performed limited-scope work despite uncertain payment.

The Motion does not grapple with that reality. It says there is "no indication" of an investigation into claims against Cannon South, but it does not say what the Debtor should have done differently. Should the Debtor have accrued much greater administrative expense on forensic accounting while the estate already potential faced administrative insolvency? Should it have filed litigation before knowing whether the City and Firm Foundation would fund the Plan? Should it have pushed the estate deeper into administrative debt to develop a claim with uncertain legal fit and uncertain collection? The Motion does not answer those questions. Movants hypothesize that a chapter 7 trustee would investigate more aggressively, but they do not identify the funds the trustee would use, how a trustee would overcome the same evidentiary problems, or how a trustee would produce a net return after chapter 7 administrative expenses.

For Mr. Pace, the Motion emphasizes that the Plan releases him but does not address the consideration for that release. The Plan discloses that Mr. Pace has served as the Debtor's Chief Executive Officer and court-appointed Debtor Representative throughout the case, without compensation. It further discloses that he holds a scheduled noncontingent, liquidated, and undisputed

Case: 24-30447    Doc# 207    Filed: 05/07/26    Entered: 05/07/26 17:54:37    Page 7 of 10
2667730.3  32645.0007

claim in the amount of $4,995,672.75. Under the Plan, he receives no cash distribution on that claim and no recovery on any administrative claim that arose before the Effective Date. Movants do not address those facts, nor explain how a chapter 7 trustee might achieve a better net result (let alone generate a return for unsecured creditors) by litigating each aspect of the compromise.

Plan Exhibit 5 also explains the Debtor's thinking on other potential litigation, and Movants do not seem to disagree with any of it.

### 3. Movants Do Not Show That Conversion Improves Creditor Recoveries.

A central defect of the Motion is its failure to compare outcomes. Movants purport to identify problems in chapter 11, but then simply assume that conversion solves them. Not so.

The Debtor's liquidation analysis shows why conversion is unlikely to improve recoveries. Despite the obstacles, the only plausible path to administrative solvency is for the Debtor to use its existing knowledge and relationships to secure payment from the City and, if necessary, compromises with subcontractors holding administrative claims. A chapter 7 trustee would receive a dispute with the City and Firm Foundation, possible preference claims, possible claims involving Cannon South, possible claims involving insiders and Factory OS-related transactions, and the HD Reliant Mayfair litigation. Each path requires certain expenditure against only possible recovery. Movants say conversion would ensure neutral decision-making about potential litigation, but the none of the available decisions would help non-priority unsecured creditors.

Conversion would also interrupt the City process. The Debtor's current management and professionals have spent months addressing the Project history, the City's role, the subcontractor balances, the mechanics lien, and possible administrative-claim compromises.

### 4. The Classification Structure Creatively Reduces Administrative Expense.

The Motion asserts that the Plan improperly separates unsecured creditors to create an impaired accepting class. Not so.

To the extent Movants are referring to Class 1, that is a convenience class specifically authorized under 11 U.S.C. § 1122(b). It includes creditors with allowed claims of $10,000 or less, as well as creditors with larger claims who elect Class 1 treatment by voluntarily reducing their allowed claims to $10,000. Those creditors receive a single 7.5% payment, capped at $750 for a $10,000 claim.

Case: 24-30447    Doc# 207    Filed: 05/07/26    Entered: 05/07/26 17:54:37    Page 8 of 10

The class provides a direct benefit to other non-priority unsecured creditors. For approximately $4,000 it fully resolves 22 claims that would otherwise have to be tracked, reconciled, objected to, reserved for, and processed through later distributions. The treatment is calibrated so that the cost of paying the class will likely be less than the attorney's fees saved by avoiding reconciling a substantial portion of the claims. If other creditors opt to join the class by reducing their claims, the benefit will be even greater. This is a legitimate, codified reason to classify claims separately.

To the extent Movants are referring to Class 2, that is a method of addressing claims that are asserted in implausible dollar amounts without requiring the estate to file and prosecute costly claim objections. As stated in the Plan, Class 2 is made up of claims which the Debtor disputes. The Plan proposes a settlement of these claims where each of the listed creditors shall have the right to elect to join Class 2, within certain parameters. This classification is an effort by the Debtor to avoid costly or protracted litigation related to objecting to these claims.

### 5. The Timing Criticism Does Not Justify Conversion Now.

Finally, Movants complain that the Debtor filed the Plan on the deadline and filed exhibits afterward. Filing a plan in that manner is, in counsel's experience, generally accepted and not inappropriate. But even if the Debtor erred in that respect, such error does not establish that conversion is in the best interests of creditors. The Plan and exhibits have been on file for some time, and they reflect carefully considered solutions to difficult problems. Movants filed the Motion after those materials existed, and they do not claim to have been prejudiced by the timing of the filing.

Nor does the Debtor contend that the Plan is ready for immediate confirmation without further work. It will require solicitation procedures, final exhibits, updates regarding the City and Firm Foundation, and either full funding or negotiated administrative-claim compromises. But that is a reason to move forward in chapter 11 for a limited period, not a reason to convert now. The question is whether the estate should be allowed a short, controlled opportunity to determine whether the Plan can become effective, or whether the Court should appoint a new fiduciary to learn the case, investigate the same claims, and pursue the same funding or litigation strategy in chapter 7.

The Plan contains its own limiting mechanism. If the Effective Date does not occur by June 5, 2026, the case automatically converts unless the Court orders otherwise. That provision prevents open-

ended delay. It gives the Debtor a defined period to determine whether City funding and administrative settlements can make the Plan effective. If not, conversion follows. Movants have not shown why the estate benefits from cutting off that process before the City decision point and before the Plan's outside date.

**D.     Conclusion**

For the foregoing reasons, the Debtor respectfully requests that the Court deny the Motion. Alternatively, the Debtor requests a short continuance and an order requiring a status report by May 18, 2026, updating the Court on the May 12 City Council closed session, discussions with Firm Foundation, administrative-creditor compromises, and whether City funding will permit the Plan to satisfy its Effective Date conditions.

DATED:  May 7, 2026                                          G&B LAW, LLP



                                                                          By: _____
                                                                                JAMES R. FELTON, ESQ.
                                                                                JEREMY H. ROTHSTEIN, ESQ.
                                                                                Attorneys for Debtor and Debtor in Possession
                                                                                Cannon Constructors North, Inc.

10

DEBTOR AND DEBTOR IN POSSESSION CANNON CONSTRUCTORS NORTH, INC.'S RESPONSE RE: MOTION TO CONVERT CHAPTER 11 CASE TO CHAPTER 7 CASE

Case: 24-30447    Doc# 207    Filed: 05/07/26    Entered: 05/07/26 17:54:37    Page 10 of 10

2667430.3 - 92643.0007